IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| EDITH WEINSTEIN,<br>Executrix of the Estate of Irwin Weinstein | ) )<br>) | |
| Plaintiff, | ) )<br>) | CIVIL ACTION NO. 2:12-cv-00154-PD |
| v. | )<br>) | JUDGE PAUL S. DIAMOND |
| | )<br>) | |
| KATHLEEN SEBELIUS,<br>Secretary of the United States Department<br>of Health and Human Services | ) )<br>) )<br>) | |
| Defendant. | )<br>) | |

## O R D E R

AND NOW, to wit, this _____ day of _____, 2012, on consideration

of the parties' Cross-Motions for Summary Judgment, IT IS HEREBY ORDERED that the

motion filed by Defendant, Kathleen Sebelius, Secretary, Department of Health and Human

Services, is GRANTED, and summary judgment is granted in favor of Defendant Sebelius.

IT IS FURTHER ORDERED that the motion filed by Plaintiff Edith Weinstein is

DENIED.


_____
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDITH WEINSTEIN,                           )
Executrix of the Estate of Irwin Weinstein )
                                           )
            Plaintiff,                     )        CIVIL ACTION NO. 2:12-cv-00154-PD
                                           )
        v.                                 )        JUDGE PAUL S. DIAMOND
                                           )
                                           )
KATHLEEN SEBELIUS,                         )
Secretary of the United States Department  )
of Health and Human Services               )
                                           )
            Defendant.                     )

## DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

AND NOW, comes Defendant, Kathleen Sebelius, Secretary, Department of Health and

Human Services, by and through her attorneys, Zane David Memeger, United States Attorney for

the Eastern District of Pennsylvania and Virginia R. Powel, Assistant U.S. Attorney for said

district and hereby moves this Honorable Court for an order pursuant to Fed. R. Civ. P. 56

granting summary judgment in favor of the Defendant and against Plaintiff.

In support of this motion, Defendant, Kathleen Sebelius, Secretary, Department of Health

and Human Services, incorporates herein the attached memorandum of law.

WHEREFORE,  defendant Kathleen Sebelius, Secretary, Department of Health and

Human Services, respectfully requests that the Court grant the instant motion, deny Plaintiff's

Cross-Motion, and enter an order in the form proposed.

                            Respectfully submitted,


                            ZANE DAVID MEMEGER
                            United States Attorney

MARGARET L. HUTCHINSON
Assistant United States Attorney
Chief, Civil Division


/s/ Virginia R. Powel
VIRGINIA R.  POWEL
Assistant United States Attorney
U.S. Attorney's Office
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA  19106-4476
(215) 861-8263


JAMES C.  NEWMAN
Chief Regional Counsel


/s/ Noreen O'Grady
NOREEN  O'GRADY
Assistant Regional Counsel
Office of the General Counsel
U.S. Department of Health and Human Services
Public Ledger Building, Suite 429
150 South Independence Mall West
Philadelphia, Pennsylvania 19106
215-861-4670

Attorneys for Defendant.


Date:  September 14, 2012

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

EDITH WEINSTEIN,                          )
Executrix of the Estate of Irwin Weinstein )
                                          )
            Plaintiff,                    )        CIVIL ACTION NO. 2:12-cv-00154-PD
                                          )
            v.                            )        JUDGE PAUL S. DIAMOND
                                          )
                                          )
KATHLEEN SEBELIUS,                        )
Secretary of the United States Department )
of Health and Human Services             )
                                          )
            Defendant.                    )

## MEMORANDUM IN SUPPORT OF
## DEFENDANT'S CROSS MOTION FOR SUMMARY JUDGMENT

Plaintiff Weinstein sued her husband's medical providers, alleging that they treated him

negligently after a stroke and, as a result, he spent nearly five months in hospitals and nursing

homes before dying from stroke-related complications.   After settling that claim, Plaintiff now

argues to Medicare,[1] which paid $90,531 for Mr. Weinstein's medical care, that the defendant

medical providers were only responsible for the first six days of care following his stroke.

Plaintiff has failed to support her argument.   Plaintiff herself contradicted this argument both by

including a wrongful death count in her underlying malpractice complaint and by asking the state

court to allocate nearly 50% of the settlement proceeds to that count.   If the medical providers

were not found responsible for Mr. Weinstein's death, no amount would have been allocated to the

---

[1]   Defendant Sebelius is the Secretary of the United States Department of Health and Human
Services (HHS).   The Centers for Medicare and Medicaid Services (CMS) is the component
within HHS responsible for administering the Medicare program.   For ease of reference, the
government defendant will be referred to as Medicare.

1

wrongful death count.   As such, Plaintiff's arguments must fail, and this Court should grant summary judgment for the Secretary.

## I.     THE MEDICARE STATUTORY AND REGULATORY SCHEME

Prior to 1980, Medicare was the primary payer for most covered medical items and services provided to Medicare beneficiaries.   In 1980, Congress enacted a series of statutes designed to stem the skyrocketing costs of the Medicare program.   *See* H.R. Rep. No. 96-1167 (1980), *reprinted in* 1980 U.S.C.C.A.N. 5526, 5752.   These statutes – collectively referred to here as the Medicare Secondary Payer (MSP) statute – require insurers and the self-insured in certain situations (here, under liability insurance) to make primary payment for services rendered to Medicare beneficiaries, leaving the Medicare program to provide benefits only as a "secondary" payer.   *See* Omnibus Reconciliation Act of 1980, Pub. L. No. 96-499, § 953, 94 Stat. 2599, 2647; 42 U.S.C. § 1395y(b) (Supp. IV 1980).

When another insurer, or "primary plan," cannot be expected to pay for a Medicare beneficiary's care promptly, the Medicare statute permits Medicare to pay, but conditions those payments on reimbursement after the primary plan makes payment.   42 U.S.C. § 1395y(b)(2)(B)(I).   "The way the system is set up the beneficiary gets the health care she needs, but medicare is entitled to reimbursement if and when the primary payer pays her."   *Cochran v. U.S. Health Care Fin. Admin.*, 291 F.3d 775, 777 (11th Cir. 2002).   *See also* H.R. Rep. No. 96-1167 (1980), *reprinted in* 1980 U.S.C.C.A.N. at 5752 ("Under this provision, it is expected that Medicare will ordinarily pay for the beneficiary's care in the usual manner and then seek reimbursement from the private insurance carrier after, and to the extent that, such carrier's liability under the private policy for the services has been determined").

2

In 2003, Congress strengthened the MSP statutes by including several additional provisions. One of the new provisions addressed a previously undefined issue: how a primary plan's responsibility for the medical care is demonstrated. Pursuant to the amendment, such responsibility is demonstrated by, among other things, "a payment conditioned upon the recipient's compromise, waiver, or release . . . of payment for items or services included in a claim against the primary plan or the primary plan's insured . . . ." Medicare Prescription Drug, Improvement and Modernization Act of 2003, P.L. 108-173, § 301(b)(2), 117 Stat 2066 (2003); 42 U.S.C. § 1395y(b)(2)(B)(ii). In other words, the extent of a primary plan's responsibility is determined by the language of the complaint and the release in the action brought against the alleged tortfeasor. If a plaintiff claims certain medical services as damages in a complaint and then releases payment for those services in settlement of a claim, the settlement demonstrates, for purposes of the MSP statute, that the defendant's insurer (the "primary plan") is responsible for paying for the claimed medical services. *See Hadden v. United States*, 661 F.3d 298, 302 (6th Cir. 2011); *Salveson v. Sebelius*, 2012 WL 1665424 (S.D.D. 2012).

Once a primary plan's responsibility is established, the plan has an obligation to reimburse Medicare. The obligation to reimburse extends, as well, to "any entity that receives payment from [the] primary plan." *Id.*[2]

---

[2]   The statute states:

> A primary plan, and an entity that receives payment from a primary plan, shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service. A primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of

3

If the Medicare program is not reimbursed, the United States may bring an action against any entity responsible for paying for the medical care, or any entity that received payment either from a primary plan, or from the proceeds of a primary plan's payment.   42 U.S.C. § 1395y(b)(2)(B)(iii).   In addition to these direct rights of action, Medicare is subrogated "to any right under this subsection of an individual or any other entity to payment with respect to such item or service under a primary plan."   42 U.S.C. § 1395y(b)(2)(B)(iv).   As these provisions demonstrate, Medicare's right of reimbursement is not limited to subrogation but also includes an independent right of recovery.   *Zinman v. Shalala*, 67 F.3d 841, 844-45 (9th Cir. 1995).   This ensures that the Medicare Trust Fund is fully reimbursed.

## II.  FACTUAL BACKGROUND

Mr. Weinstein suffered a cerebral hemorrhage, or stroke, on April 10, 2005.   He was seen at Elkins Park Hospital (Elkins Park) where a physician advised his family to transfer him to Albert Einstein Medical Center (Albert Einstein) where a stroke team would administer a particular therapy.   When Mr. Weinstein arrived at Albert Einstein, no stroke team was available and the therapy was not performed.   (A.R. 2941-43).

As the Medicare Appeals Council detailed in its decision, Mr. Weinstein's condition declined substantially during his first week at Albert Einstein.   (A.R. at 5-6).   He went from being able to follow commands to being unable even to be aroused.   He required suctioning of lung secretions because he was no longer able to cough up the secretions on his own.   His oxygen saturation levels dropped, and he had to be placed on a ventilator to breathe for him.   By early

---

payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means.

42 U.S.C. § 1395y(b)(2)(B)(ii).

May 2005, Mr. Weinstein had stabilized, and he was discharged to a rehabilitation facility.

Unfortunately, Mr. Weinstein never returned home after the stroke.   Over the next four months, Mr. Weinstein resided in three different long-term care facilities, and required two ER visits and three subsequent hospitalizations.  (A.R. Index, ii-iii; A.R. 343-44).   On September 5, 2005, Mr. Weinstein died.   Medicare paid $90,531 for the care provided to Mr. Weinstein from April 10th through September 4th.  (A.R. 344).

On June 27, 2007, Mr. Weinstein's estate, represented by his wife, sued the two doctors who treated him at Elkins Park and Albert Einstein and both hospitals.[3]  (A.R. 02937).   Ms. Weinstein alleged that the defendants' negligence caused Mr. Weinstein's prolonged hospitalization and death.  (A.R. 2944-46, ¶¶ 27, 29, 31).   Consistent with this claim, she included a wrongful death count in her suit.   In the wrongful death count, she sought the damages alleged in her complaint.  (A.R. 2947, ¶ 36).

On September 22, 2008, while the tort suit was pending, the parties reached a tentative settlement in which the defendants agreed to pay $425,000 in return for Ms. Weinstein releasing the doctors and hospitals from "any claims . . . arising from . . . all medical professional health care services rendered by" the defendants.  (A.R. 2893).   By its explicit terms, the release was conditioned "upon the court entering an Order limiting Medicare's right of recovery to $2,922.34." (A.R. 2893).   In signing the release, Ms. Weinstein agreed to "satisfy any and all valid liens . . . for reimbursement of any medical benefits . . . .  (A.R. 2894).   The release also noted that defendants would forego collection of any outstanding medical bills for Mr. Weinstein's care "from April 10, 2005 until his death."  (A.R. 2895 ¶8).

Plaintiff provided her rationale for limiting Medicare's recovery in her "Motion for Court

---

[3]   The estate also sued one of the long-term care facilities, but after a records review, that facility was dismissed.  (A.R. 2860 ¶1).

Determination of Applicable Medicare Lien," filed on September 25, 2008. Ms. Weinstein explained that a CT scan taken on April 16, 2005, revealed that Mr. Weinstein had suffered a second cerebral hemorrhage. (A.R. 2901). According to the Plaintiff, the defendants argued that this second hemorrhage, not the defendants' actions on April 10[th], caused Mr. Weinstein's injuries and death. Based on the defendants' argument, the Plaintiff asked the state trial court to ratify the parties' agreement that Medicare's recovery should be limited to $2,922 – the cost of Mr. Weinstein's care from April 10th to April 16[th].[4] (A.R. 2899).

There is no evidence that prior to filing this motion, the Plaintiff sought to find out from Medicare how much it thought was due Medicare. Instead, the Plaintiff represented to the court that the only related payment was for the first six days of the April 10th admission and submitted Medicare's notice of its payment for that admission as evidence. (A.R. 2930-33).

The trial court judge declined to rule on Plaintiff's motion and deferred to the Orphan's Court judge who was responsible for approving the settlement. (A.R. 2863). On October 30, 2008, the Plaintiff filed a motion with the Orphan's Court, entitled "Petition to Settle Wrongful Death & Survival Action." (A.R. 2858).[5] The Plaintiff included a proposed order which, among other things, approved the $425,000 settlement, purported to limit Medicare's right to recover to $2,922, and allocated over $204,000 (nearly 50% of the total settlement) to the wrongful death suit. (A.R. 2855-56). On November 20, 2008, the court adopted the order submitted by the Plaintiff virtually unchanged.[6] (A.R. 420-22).

---

[4]   Despite this argument, the estate continued to pursue its wrongful death claim.

[5]   The order was signed by Judge O'Keefe – the Administrative Judge of the Orphans' Court Division of the Common Pleas Court of Philadelphia. *See* http://www.courts.phila.gov/common-pleas/orphans/.

[6]   There is no indication in the record that either the estate or the wrongful death claimants were represented separately regarding the petition, that a hearing was held, that the Petition was

The first news Medicare received of Plaintiff's wrongful death suit was the September 25th motion. Medicare required additional information to process the Plaintiff's claim, and requested that information. (A.R. 289-94). Once Medicare obtained that information, it was then able to begin the process of determining which paid claims were related to the lawsuit. On March 17, 2009, after completing that process, Medicare notified the Plaintiff that it had paid $90,230.51 for related medical services and determined that, after the deduction of attorney's fees and costs, Plaintiff owed Medicare $58,393.57. (A.R. 338, 344).

Plaintiff disagreed with Medicare's determination and pursued her administrative appeals, seeking a reduction in the amount of Medicare's recovery. After two separate Medicare contractors considered and rejected her request (A.R. 299, 259-263), the Plaintiff sought a hearing before an administrative law judge (ALJ). (A.R. 242). The ALJ conducted an in-person hearing (A.R 366-419), and ruled in favor of the Secretary on June 29, 2010. (A.R. 94-102). The ALJ noted that the state court action was a wrongful death action and held that "the underlying claims consequently involved services up until the beneficiary's unfortunate death on September 4, 2005." (A.R. 102). The Plaintiff then appealed to the Medicare Appeals Council (MAC). On November 25, 2011, the MAC upheld the ALJ's decision (A.R. 3-22). The MAC issued a 20-page, single-spaced opinion in which it thoroughly reviewed the facts of the case and the Plaintiff's arguments. The MAC noted that the state court order was not binding on Medicare, that the Plaintiff was not entitled to the discovery she had sought, and that Medicare showed it was entitled to recover for the medical services provided up to Mr. Weinstein's death.

## III.   STANDARD OF REVIEW

Summary judgment is appropriate when "there is no genuine issue as to any material fact

---

opposed, or that any evidence was presented to the state court in support of the requested allocation.

and . . . the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Review of

agency action under the Administrative Procedure Act (APA) is usually resolved through

summary judgment, because the reviewing court does not engage in fact finding of its own; the

court's only task is to determine whether the agency's action was permissible on the basis of the

governing law. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 743–44 (1985). The

district court's review is confined to the full administrative record that was before the Secretary at

the time she made her decision. *Rite Aid of Pennsylvania, Inc. v. Houstoun*, 171 F.3d 842, 851

(3d Cir. 1999) (citing *Camp v. Pitts*, 411 U.S. 138, 142 (1973)).

The scope of judicial review under the APA is provided by 5 U.S.C. § 706. *Bowen v.*

*Massachusetts*, 487 U.S. 879, 911 (1988). Under the APA, a court "can set aside the

Administrator's decision only if it is 'unsupported by substantial evidence,' is 'arbitrary,

capricious, an abuse of discretion, or [is] otherwise not in accordance with law.' " *Mercy Home*

*Health v. Leavitt,* 436 F.3d 370, 377 (3d Cir.2006) (quoting 5 U.S.C. §§ 706(2)(A), (E)) (alteration

in original). "Substantial evidence is more than a mere scintilla. It means such relevant evidence as

a reasonable mind might accept as adequate to support a conclusion." *Albert Einstein Medical*

*Center v. Sebelius,* 566 F.3d 368, 372 (3d Cir. 2009) (internal quotation omitted). Under the

substantial evidence standard, the Secretary's findings "must be upheld unless the evidence not

only supports a contrary conclusion, but compels it." *Abdille v. Ashcroft,* 242 F.3d 477, 484 (3d

Cir. 2001).

The decision of a federal agency is entitled to deference as articulated in *Chevron U.S.A. v.*

*Natural Resources Defense Council, Inc.,* 467 U.S. 837, 842-43 (1984). *See Robert Wood*

*Johnson Univ. Hosp. v. Thompson,* 297 F.3d 273, 281 (3d Cir. 2002). Under *Chevron,* a district

court first must determine if Congress has spoken directly to the question at issue, and if Congress'

8

intent is clear, the court's inquiry ends as it "must give effect to the unambiguously expressed intent of Congress." *Chevron*, 467 U.S. at 843.   If a court decides that Congress has not spoken directly to the issue and "the statute is silent or ambiguous with respect to the specific issue," it must then ask whether the agency's interpretation is based on a "permissible construction of the statute." *Id.* If it is, the court affords deference to that interpretation.   *Id.*

As the Third Circuit has explained, courts "must give deference" to agency interpretations of a statute the agency is charged with administering

> unless that interpretation is contrary to the plain language of the statute, *Thomas Jefferson Univ. v. Shalala,* 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994), or to congressional intent as manifested in the legislative history, *Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 696-98, 111 S.Ct. 2524, 115 L.Ed.2d 604 (1991). Even where the agency's views are expressed informally, those views deserve deference where the agency has authority to administer the statute. *Cleary ex rel. Cleary v. Waldman,* 167 F.3d 801, 807-08 (3d Cir.1999) (citing *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944)).

*Robert Wood Johnson Univ. Hosp. v. Thompson,* 297 F.3d 273, 284 (3d Cir. 2002).

## IV.   ARGUMENT

### A.   The Secretary Accurately Calculated the Reimbursement Amount.

#### 1.   The Medical Services from April 10, 2005 through Mr. Weinstein's Death Are Related to the Underlying Lawsuit.

Plaintiff claimed in the underlying lawsuit that the medical defendants' negligence caused Mr. Weinstein's prolonged hospitalization and death.   Having received $425,000 from those defendants, Plaintiff now claims that they were only responsible for the 6-day period from April 10th through April 16th during which Mr. Weinstein incurred less than $3,000 in medical costs. Plaintiff cannot have it both ways.

Moreover, Plaintiff's change in position is legally irrelevant.   According to the MSP statute, the medical services for which Medicare must be reimbursed are those for which a primary

9

plan is responsible.   42 U.S.C. § 1395y(b)(2)(B)(ii).   As discussed above, the primary plan is

responsible for paying for any medical services included in a plaintiff's complaint and released in

settlement of the case.   *Id.*   The Medicare statute is clear on this point.   Thus, this case involves

the first prong of the *Chevron* analysis:   where, as here, Congress has spoken directly and clearly

to the question at issue, the court "must give effect to the unambiguously expressed intent of

Congress." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2781.

　　　　The Sixth Circuit Court of Appeals recently addressed the MSP statute's provision, added

in 2003, which defines how a primary plan's responsibility is determined.   The Court explained,

> "responsibility" is no longer an undefined term into which courts might funnel their
> own notions (or [a beneficiary's]) of equitable apportionment.   It is instead a term
> of art, which defines several ways in which a primary plan's "responsibility" can be
> demonstrated for purposes of this section.   We address only one of them here:
> specifically, under § 1395y(b)(2)(B)(ii) as amended, if a beneficiary makes a
> "claim against [a] primary plan[,]" and later receives a "payment" from the plan in
> return for a "release" as to that claim, then the plan is deemed "responsib [le]" for
> payment of the "items or services included in" the claim.   *Id.*   Consequently, the
> scope of the plan's "responsibility" for the beneficiary's medical expenses—and
> thus of his own obligation to reimburse Medicare—is ultimately defined by the
> scope of *his own claim against the third party.*   That is true even if the beneficiary
> later "compromise[s]" as to the amount owed on the claim, and even if the third
> party never admits liability. And thus a beneficiary cannot tell a third party that it is
> responsible for all of his medical expenses, on the one hand, and later tell Medicare
> that the same party was responsible for only 10% of them, on the other.

*Hadden v. United States*, 661 F.3d 298, 302 (6th Cir. 2011) (emphasis in original).

　　　　Here, the Plaintiff's complaint against the medical defendants included the injuries related

to Mr. Weinstein's prolonged hospitalization and death – costs incurred from April 10th through

September 4th.   (A.R. 2944-46, ¶¶ 27, 29, 31).   The $425,000 payment was conditioned upon the

Plaintiff's release of payment for all of these costs.   (A.R. 2893).   Neither the Plaintiff's

complaint nor the release was limited to costs incurred between April 10th and April 16th.

Consequently, for purposes of Medicare's right to reimbursement, the settlement establishes that

the defendants were responsible for Mr. Weinstein's medical care from April 10th to September 4th. As the MAC stated: "Under the Medicare Secondary Payer statute and the Secretary's implementing policies (including the MSP Manual provisions), Medicare is entitled to reimbursement . . . from the liability settlement the Plaintiff secured by alleging that the beneficiary's injuries, death, and costs for medical care resulted from medical malpractice immediately following the first stroke."[7]   (A.R. 18).   Because the Plaintiff has received payment on behalf of the doctors and hospitals for the medical services provided between April 10, 2005 and September 4, 2005, the Plaintiff is responsible for reimbursing Medicare for those costs.

The correctness of this result is buttressed by the Plaintiff's own actions.   The Plaintiff sued the medical defendants for wrongful death.   (A.R. 2947).   At the risk of stating the obvious, such an action is appropriate only if the defendants were responsible for Mr. Weinstein's death. Plaintiff made no attempt at any time to remove the wrongful death claim from her suit, as would have been appropriate had discovery revealed Mr. Weinstein's death was not caused by the medical defendants' negligence.   Not only did the Plaintiff not seek to dismiss the wrongful death claim, it asked the Orphans' Court to allocate nearly 50% of the settlement to that count.   (A.R. 2855-56).

The result is also amply supported by the release, which demonstrates that the medical expenses from April 10th through September 4th were taken into consideration in calculating and negotiating the settlement.   By her signature, the Plaintiff released the defendants from liability for "all" medical services, and agreed to resolve all reimbursement claims related to medical

---

[7]   The MAC also noted that the MSP manual provides that "[w]hen a beneficiary has filed suit for services related to exacerbation of an underlying condition as the basis of the complaint, the total amount of Medicare's payments is used to calculate the amount of Medicare's recovery.   MSPM, ch. 7, §50.4.5."

services.   In addition, the release noted that the defendants had agreed not to collect any outstanding payment for medical services rendered to Mr. Weinstein from April 10, 2005 until his death on September 5, 2005.   (A.R. 2895, ¶8).   None of these provisions were limited to the 6-day period from April 10th through April 16th.   Finally, the settlement amount of $425,000 suggests that more was at issue than a 6-day period during which Mr. Weinstein incurred less than $3,000 in medical services.

Plaintiff's claim that the government has the burden of distinguishing between the cost of the negligent and non-negligent care (Compl. ¶17) was recently rejected by another district court, *Salveson v. Sebelius*, 2012 WL 1665424 (S.D.D. 2012).   That case also involved an underlying medical malpractice case in which the plaintiff, Ms. Salveson, alleged that "[a]s a result of Defendants' negligence, Plaintiff has suffered . . . extensive medical expenses."   *Id*. at *4.   After obtaining a settlement, Ms. Salveson challenged the MSP claim, arguing among other things, that Medicare had not shown which medical care was necessitated by the medical defendants' negligence and which care would have been required regardless of their negligence.   *Id*. at *7. The court disagreed, stating it was not necessary "to re-hash the merits of Salveson's malpractice claim because 'Congress has directly spoken to the issue – in a way highly unfavorable to [Salveson].'"   *Id*. at *8 (quoting *Hadden v. United States*, 661 F.3d 298, 302 (6th Cir. 2011).   The court upheld Medicare's determination of the MSP reimbursement due the government, finding that Medicare did not have to distinguish between negligent and non-negligent care because, as in *Hadden*, "the scope of the plan's 'responsibility' for the beneficiary's medical expenses—and thus of his own obligation to reimburse Medicare—is ultimately defined by the scope of *his own claim against the third party*."   *Id*. (quoting *Hadden,* 661 F.3d at 302).

12

## 2. The State Court Order is Not an Order on the Merits and is Not Binding on Medicare.

Plaintiff argues that Medicare was bound by the Orphans' Court order limiting Medicare's claim to $2,922. Importantly, Plaintiff does not argue that order is binding because the state court had jurisdiction to determine Medicare's claim, or that the Secretary was a party to the state court action. In fact, neither of these statements are true. The Plaintiff made no effort to make the Secretary a party to the state court suit. In addition, the state court never had jurisdiction over Medicare's claim.[8] The determination of that claim is the responsibility of the Secretary. The Third Circuit has held that MSP reimbursement is a "claim arising under" the Medicare Act. *Fanning v. United States*, 346 F.3d 386, 402 (3d Cir. 2003). The Supreme Court has repeatedly held that "Section 405(g) . . . is the sole avenue for judicial review for all 'claim[s] arising under' the Medicare Act." *Heckler v. Ringer*, 466 U.S. 602, 615 (1984) (citing *Weinberger v. Salfi*, 422 U.S. 749, 760-61 (1975)); *see also Shalala v. Illinois Council on Long Term Care, Inc.*, 529 U.S. 1, 13 (2000). Section § 405(g) requires an individual to obtain a "final decision of the [Secretary]" before suing Medicare.

Instead of arguing that the state court had jurisdiction to determine Medicare's claim, the Plaintiff's sole basis for arguing that the state court order is binding on Medicare is a provision in CMS's MSP manual that is inapplicable to cases, like this one, which are resolved by settlement. The Plaintiff relies on the Medicare Secondary Payer Manual (MSPM), which states in relevant part:

> The only situation in which Medicare recognizes allocations of liability payments to **nonmedical losses** is when payment is based on a court order on the merits of the case. If the court or other adjudicator of the merits specifically designate amounts that are for

---

[8] While a state court may consider parties' competing positions and allocate damages between medical and nonmedical costs, a state court may not determine the amount due Medicare.

> payment of pain and suffering or other amounts not related to
> medical services, Medicare will accept the Court's designation.

MSPM, chapter 7, section 50.4.4 (emphasis added).   This provision applies where the parties

dispute the portion of damages attributable to medical versus nonmedical costs, and the court

adjudicating the merits of the action considers the parties' competing positions and enters an order

on the merits allocating the damages accordingly.   As the MAC recognized, this provision does

not apply to the order here, because this order "does not 'designate amounts that are for payment of

pain and suffering or other amounts not related to medical services.'"   (A.R. 13).

In addition, even assuming it were applicable, it is not an order on the merits because "it

was not preceded by any detailed submission or presentation of evidence as to the underlying

claims . . . ."   *Id.*   Further supporting this point, the order was not issued by the trial court

responsible for adjudicating the merits of the malpractice action; instead, it was issued by the

Orphans' Court, where the judge was responsible only for assuring that the settlement was fair to

the estate.   *See infra* at 6 & n.5

There is no evidence that the order at issue here was the result of an adversarial process.

As the MAC also noted, the settlement order was preceded merely by a motion and petition setting

forth very limited information," – and failing to include the full amount of Medicare's claim.

(A.R. 13).   The Plaintiff represented that only 6 days of the initial April 10th admission

(representing less than $3,000 in costs) was related to the malpractice suit, when indeed the related

services included several hospital admissions, ER visits and long-term care stays, totaling over

$90,000.   As the MAC concluded, "The state court did not adjudicate the merits of the case . . . .

Nor did it have sufficient information before it to weigh the accuracy or validity of the provision

limiting MSP recovery."   *Id.* at 14.   Instead, the Court merely ratified what the parties had agreed

14

to as a condition of settlement:   the Plaintiff would release all of her claims against the defendants for $425,000, provided the court determined that Medicare had a right to recover only $2,922 of the $90,531 it had paid.   For these reasons, the MAC properly held that the order Plaintiff relies on here is not the kind of order to which the MSP manual provision applies.

The MSP manual requirement that an order allocating a tort award to non-medical damages be "on the merits" reasonably protects Medicare from parties who achieve settlement by directing settlement proceeds to the plaintiff at the expense of Medicare.   The MAC's finding is based on this manual provision, is not contradicted by the MSP statute, and is entirely consistent with the MSP statute's purpose:   to stem the skyrocketing costs of the Medicare program by making Medicare a secondary payer to all other available insurance.   Under these circumstances, the court must defer to the MAC's determination that the order at issue here is not an order of the merits to which Medicare agrees to be bound.   *See Robert Wood Johnson Univ. Hosp. v. Thompson,* 297 F.3d 273, 284 (3d Cir. 2002) (holding that where the Secretary's informal interpretation of the Medicare statute was not contradicted by either the plain language of the statute or the legislative history, the court "must defer to the Secretary's position")

### 3. Plaintiff Has Provided No Support for the Argument that Medicare Bears the Burden of Proving Which Claims in this Case are Related to the Malpractice.

According to the MSP statute, it is the plaintiff who determines which claims are related to the tort action:   related claims are those which the plaintiff claims in the complaint and releases in the settlement.   Moreover, as the MAC discussed at length in its decision, neither of the cases on which Plaintiff relies – *United States v. Weinberg*, 2002 WL 32356399 (E.D. Pa. 2002) and *Urso v. Thompson*, 309 F. Supp. 2d 253 (D.Conn. 2004) – support Plaintiff's claim regarding the burden of proof.   (A.R. 20-21).   In addition, as the court in *Salveson* noted, the facts in *Urso* and *Weinberg*

15

predate the 2003 amendments to the MSP provisions which added the language, critical to this case, about how a primary plan's responsibility is determined.  *Salveson v. Sebelius*, 2012 WL 1665424 (D.S.D. 2012).

Moreover, courts have repeatedly placed the burden of proving entitlement to Medicare squarely on the Medicare beneficiary.  *See e.g.*, *Keefe v. Shalala*, 71 F.3d 1060, 1062 (2nd Cir. 1995); *Friedman v. Secretary of Dep't of HHS*, 819 F.2d 42, 45 (2d Cir.1987); *Beckett v. Leavitt*, 555 F. Supp. 2d 521, 526 (E.D. Pa. 2008).  Here, the Plaintiff is effectively claiming that Mr. Weinstein was entitled to have Medicare – rather than the malpractice defendants – pay for the medical items and services provided between April 10, 2005 and September 4, 2005.  Applying the cited case law, the burden of proving that entitlement is on the Plaintiff.

**B.      The ALJ Appropriately Denied the Requested Subpoenas.**

Prior to the ALJ hearing, Plaintiff asked the ALJ to issue two subpoenas to CMS,   seeking information on Medicare's practice of honoring state court orders that allocate liability payments and on the breakdown and amount of Mr. Weinstein's medical services which Medicare paid. (A.R. 118-19).    The ALJ denied the request, finding that the information sought was "not reasonably necessary for the full presentation of [Plaintiff's] case."  (A.R. 126).  The MAC affirmed the ALJ's denial.  (A.R. 17-18).  In addition, the MAC independently denied the request, providing another basis for the denial.  As the MAC explained, "the governing regulations specifically provide that an ALJ 'may not issue a subpoena to CMS or its contractors, on his or her own initiative or at the request of a party, to compel an appearance, testimony, or the production of evidence.'"  (A.R. 16 (*quoting* 42 C.F.R. § 405.1036(f)(1)).  As the MAC also noted, such discovery is only permissible when CMS elects to participate in the ALJ hearing as a

16

party.   (A.R. 16 (*citing* 42 C.F.R. § 4015.1037(1)).   Here, CMS did not participate as a party. The only party at the hearing before the ALJ was Plaintiff.   (A.R. 368).

Despite the clear regulatory prohibition, Plaintiff re-asserts her challenge here, claiming that the ALJ and the MAC should have permitted the discovery.   (Compl. ¶¶ 19-20).   Plaintiff does not mention the governing regulations.   She does not provide any authority, and indeed there is none, for permitting the discovery when the regulations specifically prohibit it.   Nor does she demonstrate that the discovery was necessary to a full presentation of her claims.   As the MAC explained, the information regarding state court orders is not applicable to this case because the order at issue here is not one on the merits, and each MSP claim is determined *sui generis*.   (A.R. 17-18).   As for the amount of the medical services paid by Medicare, the Plaintiff has already received that information.   In March 2009, Medicare issued a Payment Summary Form listing the services which Medicare determined were related to the Plaintiff's malpractice action and providing the amount paid by Medicare for each service.   (A.R. 343-44).   In addition, each time Medicare pays for a service, it issues a Medicare Summary Notice informing the beneficiary the amount Medicare paid on the claim.   *See e.g.*, A.R. 2931-33.   Plaintiff had the opportunity throughout the administrative process to raise factual issues related to specific payments and did not do so.   The one issue Plaintiff raised, that Medicare's claim is limited to the period April 10th through April 16th, is a legal issue to which the requested information is irrelevant.

## V.   CONCLUSION

Plaintiff included a wrongful death claim in her underlying complaint and asked that nearly 50% of the resulting settlement proceeds be allocated to that claim.   Plaintiff cannot now claim that the defendant's liability in the underlying case ceased on April 16, 2005, over four months before Mr. Weinstein's death.   Instead, by law, the scope of Plaintiff's duty to reimburse

Medicare is determined by her underlying complaint and the release she signed, both of which

establish that the medical services related to the underlying suit are the services provided from

April 10ʾ 2005 through September 4, 2005.

For these reasons, the Secretary requests that summary judgment be granted in favor of

Medicare and that the Plaintiff's summary judgment motion be denied.

Respectfully submitted,

ZANE DAVID MEMEGER
United States Attorney

MARGARET L. HUTCHINSON
Assistant United States Attorney
Chief, Civil Division

/s/ Virginia R. Powel
VIRGINIA R. POWEL
Assistant United States Attorney
United State's Attorney's Office
Eastern District of Pennsylvania
615 Chestnut Street, Suite 1250
Philadelphia, PA   19106-4476
(215) 861-8263

JAMES C.   NEWMAN
Chief Regional Counsel

/s/ Noreen O'Grady
NOREEN   O'GRADY
Assistant Regional Counsel
Office of the General Counsel
U.S. Department of Health and Human Services
Public Ledger Building, Suite 429
150 South Independence Mall West
Philadelphia, Pennsylvania 19106
215-861-4670

Attorneys for Defendant

Date:   September 14, 2012

## CERTIFICATE OF SERVICE

I hereby certify that on this 14TH day of September, 2012, a true and correct copy of the Defendant's Cross Motion for Summary Judgment was electronically filed and served, upon the following:

James I. Devine
509 Swede Street
Norristown, PA 19401
jamesdevinelawoffice@gmail.com

/s/ Virginia R. Powel
VIRGINIA R. POWEL
Assistant U.S. Attorney